# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

PATRICIA MENGESHA individually and
on behalf of all others similarly situated,

    Plaintiff,

v.

Bitconnect International PLC,
Bitconnect LTD, and
Bitconnect Trading LTD,

    Defendants.

Court File No. _____

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff, Patricia Mengesha ("Plaintiff"), tenders the following as her Complaint and Jury Demand against Defendants Bitconnect International, PLC, Bitconnect LTD and Bitconnect Trading, LTD (collectively, "Bitconnect"), on behalf of herself and others similarly situated ("Class"), for financial losses suffered from an online investment scam.

## INTRODUCTION

1.     Bitconnect scammed thousands of Minnesotans and hundreds of thousands of Americans out of millions and millions of dollars through a website called bitconnect.co.

2.     Bitconnect took advantage of the increased attention, interest and success of cryptocurrencies and legitimate companies and technology to convince Plaintiff and the class that they would make money on their investment in Bitconnect's product.

3.     Bitconnect was both a pyramid scheme and a Ponzi scheme. That is, it relied on new money from new users, who were in turn expected to get more new users to produce

more new money, while not actually engaging in any real activity that would produce income, profits or benefit to investors.

4.      In its scheme, Bitconnect required Plaintiff and the Class to provide Bitconnect with Bitcoin, which it would exchange for Bitconnect Coins ("BCC").  With this transaction, Bitconnect promised to Plaintiff and the Class fixed returns as well as a guarantee that the principal investment/loan amount would be paid in full on date certain.

5.      Instead, Bitconnect shut down its platform, took all of Plaintiff and the Class's money, and left them with BCC, which is either entirely worthless or has significantly less value than Bitconnect promised.

6.      Plaintiff and the Class were damaged and Bitconnect has profited handsomely at the expense of Plaintiff and the Class.

7.      Plaintiff seeks monetary damages for these losses, in an amount to be determined at trial.

8.      Plaintiff also seeks injunctive relief, in the form of: (1) specific enforcement of the contract between Bitconnect and Plaintiff and the Class; (2) a return of all money and/or cryptocurrencies given to Bitconnect by Plaintiff and the Class; (3) disgorgement of all monies earned by Defendants due to their conduct; and/or (4) an immediate order enjoining Bitconnect and its owners, members and Board of Directors from transferring, selling, spending or otherwise dissipating any assets so that Plaintiff and the Class can recover the money owed to them.

## JURISDICTION

9.      This Court has jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the proposed Class consists of 100 or more members; the amount in controversy exceeds $5,000,000, exclusive of costs and interest; and minimal diversity exists. This Court also has supplemental jurisdiction over the Minnesota state law claims pursuant to 28 U.S.C. § 1367.

10.     This Court has jurisdiction over Defendants because the injuries occurred in this District because of the specific actions of the Defendants purposefully, knowingly and intentionally reached this District.  Bitconnect operated a website and allowed Plaintiff and the Class to sign up for the website with their Minnesota addresses.

## VENUE

11.     Venue is proper in the District of Minnesota under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. Plaintiff resides in this District, viewed Defendants' representations and misrepresentations in this District, engaged in commerce with Defendants from her computer in this District, and otherwise specifically performed her end of the bargain in this District.

## PARTIES

12.     Plaintiff, Patricia Mengesha is an individual living in Dakota County, Minnesota, within this District.

13.     Defendants Bitconnect International, PLC, Bitconnect LTD and Bitconnect Trading, LTD (collectively, "Bitconnect") are foreign, for-profit companies organized

under the laws of the United Kingdom, doing business worldwide through the website bitconnect.co.

14.    Bitconnect International's principal place of business is Grant Thornton House, 22 Melton Street, Kings Cross, London, United Kingdom NW 1 2EP.

15.    Bitconnect LTD's principal place of business is The Panorama, Park Street, Ashford, United Kingdom TN24 8EZ.

16.    Bitconnect Trading LTD's principal place of business is 23 St. Elizabeth Avenue, Bootle, United Kingdom, L20 6FA.

## FACTUAL ALLEGATIONS

17.    A blockchain is a distributed record of transactions, usually managed by a peer-to-peer network of computers that validates the transactions.

18.    Bitcoin, a digital currency, is the most well-known type of blockchain and became synonymous with blockchain technology in the public consciousness in 2017 thanks to the huge spike in Bitcoin's price.  Bitcoin began 2017 at around $1,000 per coin, and reached highs of above $19,000 in early December, before falling back to around $12,000 in mid-January 2018.

19.    Alongside Bitcoin, other blockchain "coins" had huge increases in 2017.  For instance, Ethereum, another blockchain, had its coin, ETH, priced at around $8 on January 1, 2017, and ended 2017 at around $721.

20.    Bitcoin, ETH and all cryptocurrency coins are volatile, unstable, subject to the whims of investors worldwide, and undergo huge price swings on a daily basis and across various different exchanges.  Cryptocurrency is inherently volatile.

21.     Against this backdrop, Bitconnect created a trading and lending platform that promised substantial, fixed returns and a complete return of principal at a fixed time in the future that benefited from volatility.

22.     That is, users like Plaintiff and the Class would invest money in Bitconnect through a "lending" platform, Bitconnect would pay them a daily interest rate, and a bonus interest percentage, and then return the principal amount "lent" or invested.

23.     Bitconnect promised these returns through a secret, proprietary trading algorithm called "volatility software interest," which it claimed would produce returns sufficient to pay these fixed interest rates plus bonuses for bigger investors.

24.     Bitconnect repeatedly referred to this as an investment, and offered and sold its investments through its "Bitconnect Lending Program."

25.     To effectuate the transactions described in this Complaint, Bitconnect created its own coin called BitConnect Coin ("BCC").  BCC had no inherent value and no use other than trading for Bitcoin.

26.     Under the "Bitconnect Lending Program," investors would "invest" into the BitConnect BCC Exchange with Bitcoin – either by using Bitcoin already owned or purchasing Bitcoin with a fiat currency.

27.     Once the investor deposited his or her Bitcoin into the BitConnect BCC Exchange platform, Bitconnect instructed the investors to sell his or her Bitcoin to Bitconnect in exchange for Bitconnect's digital coin, BCC.

28.     Then, Bitconnect instructed the investors to "lend" their BCC back to BitConnect, explaining that the BCC "lent" will be used to fund the trading activities of its secret, proprietary trading system called "volatility software."

29.     On January 9, 2018, the Secretary of State of North Carolina issued a Temporary Cease and Desist Order against Bitconnect to stop them from violating state securities laws. Many of the details and allegations herein were alleged by North Carolina in seeking and issuing its Order.

30.     Bitconnect describes itself as "an open source all in one bitcoin and crypto community platform designed to provide multiple investment opportunities with cryptocurrency education where it is entirely possible to find the independence we all desire, in a community of like-minded, freedom loving individuals who, like you, are seeking the possibility of income stability in a very unstable world."

31.     Bitconnect claimed investors could "begin staking or holding BitConnect Coin and watch [their] interest grow" and that "the more [investors] hold, the more [they] earn."

32.     Bitconnect represented that:

   a.   BitConnect Coin is "the investment tool [investors] need to jump start [their] financial security;"

   b.   Investors can "[s]ecure [their] future by gaining quick profit growth for tomorrow that is practical and attainable;"

    c.  The investment ensures "financial freedom is available and [investors] can start today. Store and invest wealth and earn substantial interest and investment;" and

    d.  Investors who purchase BitConnect Coin are purchasing "an interest bearing asset with 120% return per year. It is that simple."

33.    These representations, while seemingly too good to be true for most investments, were in line with the rise of cryptocurrency trading and investing in 2017, and therefore were believable and concrete, and made it reasonable for Plaintiff and the Class to rely upon and believe these representations.

34.    Bitconnect offered up to 40% interest per month through its secret trading system it called "volatility software."

35.    Bitconnect published the following graphic on its website, which Plaintiff and the Class saw and relied upon, that stated:



36.     Bitconnect touted the lending program investment as a "safe way to earn a high rate of return on…investment[s] without having to undergo a significant amount of risk."

37.     Bitconnect provided a chart that bolstered the misrepresentation that the returns from the BitConnect Lending Program are guaranteed, and that Plaintiff and the Class would receive the principal capital invested within a set period of time, and that the more money invested, the sooner Plaintiff and the Class would receive the money back:

**BitConnect Coin Lending Profits Interest**

| Lending Amount | Interest (Accrued Daily) | Capital Back |
|---|---|---|
| $100 - $1000 | Volatility Software Interest (up to 40 % Per Month) | After 299 Days |
| $1010 - $5000 | Volatility Software Interest + 0.10% Daily (up to 40 % Per Month) | After 239 Days |
| $5010 - $10000 | Volatility Software Interest + 0.20% Daily (up to 40 % Per Month) | After 179 Days |
| $10010 - $100000 | Volatility Software Interest + 0.25% Daily (up to 40 % Per Month) | After 120 Days |

38.     Bitconnect published daily interest and interest histories to show how much it had paid out over a previous term:



39.     Bitconnect repeatedly referred to the lending program as an investment on its website:

    a.    "You can invest BitConnect coin in BitConnect lending platform exclusively from the BitConnect Dashboard. This investment option involves profiting from BitConnect trading bot and volatility software. You will receive daily profit based on your investment option;"

    b.    "Upon investment term completion, you will receive your CAPITAL BACK to take out from the BitConnect lending platform or optionally reinvest back in lending platform to continue receiving daily profit;" and

c.    "It takes 15 days to mature your coin from last received interest

block. Once you received interest block in your staking wallet, you

are required to wait for another 15 days to find next interest block."

40.    Bitconnect provided daily interest charts that showed no days with negative

returns on the entire chart:



41.    An average daily interest rate of 1% would produce average yearly returns

of 3,000%, which, while rare in financial markets, is in line with the returns seen in crypto

markets in 2017. Accordingly, Plaintiff and the Class reasonably believed that these returns

were available to them here.

42.    Plaintiff and Class would have expected to profit from the efforts of

Bitconnect and its agents.

43.    Plaintiff and Class would have believed, based on Bitconnect's statements in

its promotional materials, that investors could profit by merely holding and staking BCC

tokens, or enjoying the guaranteed returns provided by Bitconnect's proprietary, secret trading system that it calls "volatility software." Further, investors would have expected that Bitconnect and its agents would expend significant efforts to continue to develop the proprietary, secret trading system that it calls "volatility software," and that such development would increase the value of their BCC.

44.     Bitconnect represented to Plaintiff and the Class that "Investing on BitConnect platform…is a safe way to earn a high rate of return on your investment without having to undergo a significant amount of risk."

45.     Bitconnect also represented to Plaintiff and the Class that "The interest rate that we can guarantee on your investment while using our investment platform is calculated by our BitConnect Price Volatility Software and accrued daily."

46.     Based on the statements listed above, Plaintiff and the class reasonably expected that they would profit solely from the essential managerial efforts of Bitconnect.

47.     Bitconnect investments are "securities" as defined in Minn, Stat. 80A.41.

48.     Bitconnect unlawfully offered and sold unregistered securities in Minnesota in violation of Minn. Stat. 80A.49.

49.     Further, in violation of Minn. Stat. 80A.56, Bitconnect unlawfully transacted business with individuals in Minnesota as a broker-dealer without registering as a "broker-dealer."

50.     Under Minn. Stat. 80A.68, it is unlawful for any person or entity, in connection with the offer or sale of any security, whether offered or sold indirectly or directly: "(a) to employ any device, scheme, or artifice to defraud; (b) to make any untrue

statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."

51.    Defendants violated Minn. Stat. 80A.68 when, in connection with the offer or sale of a security to Plaintiff and the Class, employed a scheme to defraud Plaintiff and the Class, made untrue and misleading statements of material facts, and engaged in a practice and course of business which operated as a fraud on Plaintiff and the Class.

52.    Bitconnect intentionally misled Plaintiff and the Class, and intentionally withheld material facts about Bitconnect from Plaintiff and the Class, including, but not limited to, the following:

   a. The identity of the principals of Bitconnect and the true location of Bitconnect's operations and management;

   b. Information about the assets and liabilities of Bitconnect and any other information that indicates the means by which Bitconnect will provide investors with a guaranteed daily return, regardless of the value of Bitcoin;

   c. Information about the proprietary, secret trading system that it calls its "volatility software," details of its trading records and historical performance, proof of its existence, and the risk factors associated with its use;

   d. That the Bitconnect investments are securities and are not registered with the Administrator or any other governing regulator;

   e. That only registered dealers or agents can be paid commissions for referrals or sales of securities; and

f.   That affiliates who receive such commissions for their sale of Bitconnect investments without being properly registered are in violation of the Securities Act of 1933.

53.   In addition, Bitconnect had token language about investment risks on its website.  In the Risk Disclosure section of its website, which it did not require any user to actually view before using Bitconnect and depositing money, Bitconnect noted that "There is no guarantee of investor's capital if the lending system fails due to any of the reasons mentioned above."

54.   Those reasons were:



**Risk Disclosure**

Virtual currency such as Bitcoin is not legal tender, and is not backed by the government. Legislative and regulatory changes or actions at the state, federal, or international level may adversely affect the use, transfer, exchange and value of Bitcoin. Transactions in virtual currency such as Bitcoin are irreversible, and accidental transactions may not be recoverable. The volatility and unpredictability of the price of virtual currency relative to the fiat currency may result in significant loss over a short periods of time. Any technological difficulties experienced by the Bitconnect system may prevent the access or use of members virtual currency temporarily or permanently, depending on the severity of damage.

There are risks associated with trading and investing. If there should be a system failure, hacking incident or technical failure these terms apply to the members.

For lending, we pool the member's funds for our volatility software and trading bot. This is in case we make a loss with trading or there is any technical failure of the platform or a sudden drop in asset value that we are holding.

In lending, the member agrees that they cannot terminate their contract before the term plan has ended which the member has chosen.

All lending activities are reported in lending wallet consequently members will receive all capital and interest payments in lending wallet and you are required to Transfer your lending wallet balance to your Bitconnect wallet at the current BCC exchange rate.

Members should note that there is no guarantee of daily profit for lending.

Bitconnect reserves the right to institute and implement new rules of paying interest and capital if Bitconnect lending fail in any way.

Bitconnect reserve the right to change the lending algorithm, the interest payment and capital back system.

There is no guarantee of investor's capital if the lending system fails due to any of the reasons mentioned above.

55.     Not listed is that disclosure was a risk Bitconnect could unilaterally shut down its lending platform, convert all of people's investments into BCC, tank the market for BCC by eliminating any future value of BCC, and close up shop.

56.     Not listed in the disclosure was the reason or reasons that Bitconnect actually shut down its lending platform, causing Plaintiff and the Class to lose their investments.

57.     Nor did Bitconnect properly disclaim any promises of profits, returns, or the ability to unilaterally alter the contract and not pay back the investment principal, in full, on the date promised.

58.     On January 4, 2018, the Texas State Securities Board issued an emergency cease and desist order against Bitconnect.   On January 12, the North Carolina Order was issued.   The next day, on January 13, Bitconnect's website went down.   According to Bitconnect's Twitter account, this was due to "server issues," which it then said were caused by an attack by unnamed people through a DDoS process (also known as "denial of service" attack).   A few days later, the website was back up, but the lending program had been shut down.

///


///



**BitConnect** @bitconnect · Jan 15
Due to technical difficulties the BitConnect X ICO will not be open on Jan 16th 2018. You will not be able to log in to the dashboard. The following day we will reopen allowing new registrations and offering twice as much BitConnect X (522.666 Bccx) to be purchased. @bitconnect

♡ 2.0K   ⟲ 148   ♡ 749   ✉

**BitConnect** @bitconnect · Jan 15
The website is under control from the attack and we have enabled the website and dashboard. At the moment you can not perform exchange activities. The exchange will take another 24 hours to work as usual. Withdrawals from wallets will be restored as soon as possible.@bitconnect

♡ 1.0K   ⟲ 240   ♡ 1.4K   ✉

**BitConnect** @bitconnect · Jan 15
To visit the website front you will require to check a box that says "I'm not a robot." We will enable login in to dashboard as soon as we realize everything under control. @bitconnect

♡ 1.1K   ⟲ 224   ♡ 1.6K   ✉

**BitConnect** @bitconnect · Jan 15
It seems attack is under control and we have enabled the website front. At the moment you can not login dashboard. If you are receiving any difficulties accessing the website front, just report it. @bitconnect

♡ 471   ⟲ 182   ♡ 1.2K   ✉

**BitConnect** @bitconnect · Jan 14
"We are still under DDos attack, thank you for your patience…. we are still working on it!!!"@bitconnect

♡ 1.0K   ⟲ 246   ♡ 1.6K   ✉

**BitConnect** @bitconnect · Jan 14
The website is still under DDos attack and we are monitoring on it. We request not to do a valuable transaction until the incident has been completely resolved. We apologize for any inconvenience this may cause @bitconnect

♡ 547   ⟲ 255   ♡ 995   ✉

**BitConnect** @bitconnect · Jan 13
We've been under continuous DDoS attack which inevitably affects our service. We're mitigating as fast as we can.
It may take up to 24 hours. Will update you once it is under control. We apologize for any inconvenience this may cause @bitconnect

♡ 487   ⟲ 263   ♡ 1.1K   ✉

**BitConnect** @bitconnect · Jan 13
We are still working to resolve this disruption within our service. Thank you for your patience during this time. Will update you once its done. @bitconnect

♡ 236   ⟲ 136   ♡ 770   ✉

**BitConnect** @bitconnect · Jan 13
@bitconnect .co website is currently down due to server issues. We apologize for the inconvenience

♡ 94   ⟲ 82   ♡ 421   ✉

59.     Plaintiff and the Class logged on to find their entire account had been converted to BCC at a price of $363 each and that Bitconnect would no longer honor the promises for paying interest and return of principal in the lending program.  The price of BCC plummeted on the exchanges when Bitconnect announced it had closed the trading platform.  As of January 25, 2018, the price was down to $11.03.

60.     Relying on the representations of Defendants, Plaintiff first invested $1,010 with Defendants on December 27, 2017.

61.     She made her second investment, for $1,420, on January 6, 2018.

62.     After receiving returns on her initial, smaller investments (another hallmark of Ponzi schemes), Plaintiff deposited another $10,100 on January 12, 2018, just one day before Defendants shut down their website.

63.     She attempted to reverse or stop her last transaction, but was unable to do so. Overall, she deposited and received initial interest payments for a sum total of $12,770 on Bitconnect.

64.     As of today, Plaintiff's investment is worth a few hundred dollars.

## CLASS ALLEGATIONS

65.     Plaintiff brings this action on behalf of himself and as a class action, pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class ("The Minnesota Class"):

**The Minnesota Class**

**All Minnesota residents who invested money in the Bitconnect lending program between January 25, 2017 and January 17, 2018, through the transfer of Bitcoin or any other currency to Bitconnect.**

66.     Excluded from the Class are Defendants and their subsidiaries; all persons who make a timely election to be excluded from the Class; governmental entities; and the judge to whom this case is assigned and his/her immediate family. Plaintiff reserves the right to revise the Class definition based upon information learned through discovery.

67.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

68.     This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.

69.     Numerosity. Federal Rule of Civil Procedure 23(a)(1): The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. While Plaintiff is informed and believes that there are not less than hundreds of thousands of members of the Class, the precise number of Class members in Minnesota is unknown to Plaintiff, but may be ascertained from Defendants' books and records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

70.     Commonality and Predominance: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

    a.   Whether Defendants engaged in the conduct alleged herein;

    b.   Whether Defendants violated federal and state securities law;

    c.   Whether Defendants' representations about Bitconnect were false, misleading, fraudulent other otherwise untrue;

    d.   Whether BCC and/or the Bitconnect lending program was an investment;

    e.   Whether Bitconnect and Plaintiff and the Class entered into an investment contract with promises by Bitconnect;

    f.   Whether the Defendants misrepresented the risks of Bitconnect;

    g.   Whether Bitconnect knowingly and intentionally operated a Ponzi scheme and/or pyramid scheme;

    h.   Whether Plaintiff and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

71.     Typicality: Federal Rule of Civil Procedure 23(a)(3): Plaintiff's claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through Defendants' wrongful conduct as described above.

72.     Adequacy: Federal Rule of Civil Procedure 23(a)(4): Plaintiff is an adequate Class representative because her interests do not conflict with the interests of the other members of the Classes she seeks to represent; Plaintiff has retained counsel competent and experienced in complex class action litigation; and Plaintiff intends to prosecute this

action vigorously. The Classes' interests will be fairly and adequately protected by Plaintiff and her counsel.

73.     Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2): Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

74.     Superiority: Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for members of the proposed Minnesota Class to individually seek redress for Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

<u>COUNT I</u>
<u>VIOLATION OF MINNESOTA SECURITIES LAWS</u>

75.     Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

76.     Defendants violated Minnesota securities laws, specifically Minn. Stat. § 80A.40, *et seq.*, through their actions detailed above.

77.     As a result of the violation of this statute, Plaintiff and the Class lost money in investments that they otherwise would not have made had they known the truth.

78.     Minnesota law provides a private right of action for violation of this statute, as Plaintiff and the Class were those specifically intended to be protected by this statute, and Defendants' conduct falls within the exact public policy this statute intends to protect.

<u>COUNT II</u>
<u>VIOLATION OF SECTION 5(A) AND 5(C)</u>
<u>OF THE FEDERAL SECURITIES ACT</u>

79.     Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

80.     Defendants violated federal securities laws through their use of websites and transactions in interstate commerce as described in detail above.

81.     Defendants are each a "seller" under 15 U.S.C. 77e because it and/or its agents solicited investments from Plaintiff and the Class.

82.     The Bitcoin, money or other things of value paid by Plaintiff and the Class were pooled by Bitconnect so that it could profit for itself at the expense of investors such

as Plaintiff and the Class.  As a result, Plaintiff and the Class, shared in the risks and benefits of the investments.

83.     Plaintiff and the Class were reliant on and depended on the expertise of Defendants for their investment returns.

84.     Plaintiff and the Class reasonably expected to receive profits from their investments with and through Defendants.

85.     Bitconnect's investment platform and BCC are investment contracts, subject to federal securities laws, and therefore, Defendants were required to register BCC as such.

86.     However, Defendants failed to register BCC or the Bitconnect lending platform with the Securities and Exchange Commission ("SEC") or any federal agency.

87.     Defendants' conduct violates 5(a) and 5(c) of the Securities Act, 15 USC 77e(a) and 77e(c).

88.     Because of Defendants' unregistered sales of securities, Plaintiff and the Class suffered damages as described above.

**COUNT III**
**BREACH OF CONTRACT**

89.     Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

90.     The terms of the transaction between Plaintiff and Bitconnect and the Class and Bitconnect are a contract under which Bitconnect would pay a daily interest rate, plus bonus percentage, plus return principal on a specific date.

91.     The terms of the contract were clear, unambiguous, not subject to any other interpretation other than where Plaintiff would receive the benefit of the bargain.

92.     Bitconnect has breached the contract by failing to pay daily interest, failing to pay bonus interest, and failing to return Plaintiff's principal.

93.     Instead, Bitconnect unilaterally converted Plaintiff's investment into a worthless BCC token that has little to no value, and shut down the lending platform.

94.     Plaintiff and the Class are entitled to damages from the breach of contract as alleged above, including, but not limited to, return of principal, interest, attorneys' fees and other foreseeable damages from the total loss of this investment.

### COUNT IV
### FRAUD BY CONCEALMENT

95.     Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

96.     Defendants intentionally concealed and suppressed material facts concerning the true nature of the investment as described in detail above.

97.     Plaintiff and the Class reasonably relied upon Defendants' false representations.

98.     Defendants' false representations were material to Plaintiff because it went to the heart of the bargain, an easy return on investment in the volatile and complicated cryptocurrency market.

99.     Defendants had a duty to disclose the scheme it was engaged in because they had exclusive knowledge as to implementation and maintenance of their scheme, and because they knew facts not known to or reasonably discoverable by Plaintiff or the Class.

100.    Defendants actively concealed and/or suppressed these material facts as described above, in whole or in part, to pad and protect its profits and to avoid scrutiny over its claimed investment returns.

101.    On information and belief, Defendants have still not made full and adequate disclosures, and continue to attempt to defraud Plaintiff and the Class by concealing material information regarding the true value of BCC, and otherwise continuing to engage in the behavior complained of above in new schemes and frauds.

102.    Because of the concealment and/or suppression of the facts, Plaintiff and the Class have sustained damages as outlined above.  Accordingly, Defendants are liable to Plaintiff and the Class for damages in an amount to be proven at trial.

103.    Defendants' actions were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Plaintiff and the Class, and the conduct as alleged warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which is to be determined according to proof.

## COUNT V

## VIOLATIONS OF THE MINNESOTA
## PREVENTION OF CONSUMER FRAUD ACT

104.    Plaintiff incorporates by reference and re-alleges each and every paragraph alleged above as though fully alleged herein.

105.    Plaintiff is a resident of the State of Minnesota.

106.    Minnesota's Private Attorney General Statute (Minn. Stat. § 8.31, subd. 3a) allows Plaintiff and the Class to bring a claim under Minn. Stat. § 325F.69.

107.    The Minnesota Prevention of Consumer Fraud Act prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby. . ." Minn. Stat. § 325F.69(1). Defendants advertised and represented to Plaintiff and members of the Class that Bitconnect possessed certain qualities, value and guaranteed profits, including, but not limited to, fixed returns as well as a guarantee that the principal investment/loan amount would be paid in full on date certain. Other states across the Country have enacted substantially similar consumer protection statutes which require the same or similar showings of proof, and which prevent the unlawful conduct described herein.

108.    Defendants' advertisements and representations with respect to Bitconnect and the Ponzi scheme were made in connection with the inducing Plaintiff and the Class to invest in Bitconnect.

109.    Defendants intentionally and/or knowingly misrepresented the true nature and likely success of their investment to Plaintiff and the Class.

110.    Defendants boasted:

   a.  BitConnect Coin is "the investment tool [investors] need to jump start [their] financial security;"
   b.  Investors can "[s]ecure [their] future by gaining quick profit growth for tomorrow that is practical and attainable;"

   c.  The investment ensures "financial freedom is available and [investors] can start today. Store and invest wealth and earn substantial interest and investment;" and

   d.  Investors who purchase BitConnect Coin are purchasing "an interest bearing asset with 120% return per year. It is that simple."

111.    Defendants intended for Plaintiff and the Class to rely on, and accept as true, these statements and representations in deciding whether to invest in Bitconnect.

112.    Plaintiff and the Class relied on, and were in fact deceived by, Defendants' statements and representations about the true nature and likely profitability of any investment on Bitconnect.

113.    Defendants' unfair or deceptive acts or practices were likely to deceive reasonable consumers.

114.    Plaintiff and the Class were injured in fact and suffered actual damages as a result of their reliance on Defendants' advertisements and representations. Defendants' wrongful conduct was the direct and proximate cause of the injuries to Plaintiff and the Class. Because of Defendants' fraudulent conduct, Plaintiff and the Class have suffered direct and indirect harm and monetary loss.

115.   Had Plaintiff and the Class been aware of the true nature of any investment, along with and intention to shut down Bitconnect and take all monies by Defendants, Plaintiff and the Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

116.   Pursuant to Minn. Stat. § 8.31, subd. 3a, Plaintiff and the Class seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota Prevention of Consumer Fraud Act.

## COUNT VI
## FALSE ADVERTISING

117.   Plaintiff incorporates by reference each of the allegations contained in the preceding paragraphs of this Complaint.

118.   Plaintiff is a resident of the State of Minnesota.

119.   Minnesota's False Statement in Advertising Act ("FSAA"), Minn. Stat. § 325F.67, provides a cause of action to "any person, firm, corporation, or association" who purchases goods or services through advertising which "contains any material assertion, representation, or statement of fact which is untrue, deceptive, or misleading." Consumer protection laws of other states make similar conduct unlawful.

120.   Where, as here, Plaintiff's claims inure to the public benefit, Minnesota's Private-Attorney General Statute, Minn. Stat. § 8.31, subd. 3a, allows individuals who have been injured through a violation of the FSAA to bring a civil action and recover damages, together with costs and disbursements, including reasonable attorney's fees.

121.    By engaging in the conduct herein, Defendants violated and continue to violate Minn. Stat. § 325F.67 and the similar laws of other states.

122.    Defendants' misrepresentations, knowing omissions, and use of other sharp business practices include, by way of example:

      a.    Defendants' fraudulent, misleading, and deceptive statements relating to Bitconnect and the promised fixed returns as well as a guarantee that the principal investment/loan amount would be paid in full on date certain.

      b.    Defendants' fraud and misrepresentations by omission with respect to failing to disclose that in fact they were not actually engaging in any real activity that would produce income, profits or benefit to investors, like Plaintiff and the Class.

      c.    Defendants' concealment of the true nature of the Bitconnect.

123.    As a result of Defendants' conduct, Plaintiff has suffered actual damages in that he has purchased the Loader that was defective and worth less than the price he paid. There is an association between Defendants' acts and omissions as alleged herein and the damages suffered by Plaintiff.

124.    As a result of Defendants' untrue, deceptive, and misleading assertions and representations about Bitconnect, Plaintiff has and will continue to suffer damages that include not only the full cost to replace the Loader, but also include, without limitation, consequential and incidental damages.

125.    Defendants have similarly violated the consumer-protection statutes of the various states including, but not limited to, the State of California.

126.    Plaintiff and the class have been damaged in an amount in excess of $5,000,000.00.

## COUNT VII
## <u>FRAUDULENT INDUCEMENT</u>

127.    Plaintiff incorporates by reference each of the allegations contained in the preceding paragraphs of this Complaint.

128.    To induce Plaintiff and the Class members into entering the pyramid scheme and Ponzi scheme by misrepresented that Plaintiff and the Class would receive fixed returns as well as a guarantee that the principal investment/loan amount would be paid in full on date certain while not actually engaging in any real activity that would produce income, profits or benefit to investors.

129.    Defendants knew that their representations were false. Defendants made sure their promotional materials to intentionally mislead consumers, such as Plaintiff and the Class.

130.    Defendants made these misrepresentations specifically so as to induce Plaintiff's and the Class's to invest.

131.    Plaintiff and the Class did in fact rely on these misrepresentations and invested in the Ponzi scheme to their detriment. Given the deceptive manner in which Defendants advertised, represented and otherwise promoted the investment, Plaintiff and the Class's reliance on Defendants' misrepresentations was justifiable.

132.    As a result of relying on Defendants' misrepresentations, Plaintiff and Class members have suffered, and will continue to suffer, actual damages.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, individually and on the Class, respectfully requests that the Court enter judgment in their favor and against Defendants, as follows:

A.      Certification of the proposed Class(es), including appointment of Plaintiff's counsel as Class Counsel;

B.      An order temporarily and permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.      An order temporarily and permanently enjoining Defendants from selling, liquidating, transferring, spending or otherwise dissipating assets earned from Plaintiff and the Class;

D.      Injunctive relief in the form of a rescission, refund or replacement program to make Plaintiff and the Class whole;

E.      Costs, restitution, damages, including punitive damages, and disgorgement in an amount to be determined at a jury trial;

F.      An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

G.      An award of costs and attorneys' fees; and

H.      Such other or further relief as may be appropriate.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury as to all issues.

Dated:  January 31, 2018                **LOCKRIDGE GRINDAL NAUEN P.L.L.P.**

By:   /s/  Robert K. Shelquist
_____
     Robert K. Shelquist, #21310X
     Rebecca A. Peterson, #392663
100 South Washington Avenue, Suite 2200
Minneapolis, MN 55401
Telephone:  (612) 339-6900
rkshelquist@locklaw.com
rapeterson@locklaw.com

Genevieve Zimmerman (MN #330292)
MESHBESHER & SPENCE LTD.
1616 Park Avenue South
Minneapolis, MN 55404
Telephone:  (612) 339-9121
gzimmerman@meshbesher.com

***Attorneys For Plaintiff***